The People of the State of New York, Respondents, *v.* Thomas C. Fields, impleaded, etc., Appellant.

By the provision of the annual tax levy for the city of New York (§ 7, chap. 876, Laws of 1869) authorizing the comptroller of said city to audit, adjust and pay "claims, not to exceed the sum of $50,000, of members" of certain fire companies, the legislature did not intend to declare the legality of said claims; but as there was no basis either in law or equity for a demand of payment as of right, a gratuity was intended. The restriction as to amount applied as well to the auditing and adjusting as to the payment, and the comptroller had no authority to audit or to find "to be due" a greater sum than that specified. The provision required him simply to adjust the amount of the gifts to the number of claimants and their relative interests therein.

The provision of the city tax levy for 1870 (§ 7, chap. 383, Laws of 1870) authorizing the comptroller to pay the claims "found to be due" under the act of 1869, included only claims thus legally adjusted, and the same limitation applied.

Accordingly *held*, that an audit and payment by the comptroller, out of the avails of the bonds of said city issued ostensibly in pursuance of said acts, of a sum greater than $50,000, was illegal, and that defendant, to whom as assignee of the beneficiaries mentioned in the said acts the money was paid, was chargeable with knowledge of this and was liable for the excess.

*It seems*, the same liability would have attached although he received it as attorney for the claimants and retained only a share as agreed upon between them.

The title, however, to the money so paid and the right of action to recover the same, is in the city not the State, and no action can be maintained by the latter therefor. (Church, Ch. J., and Rapallo, J., dissenting.)

The fact that the legislative direction was to raise money for the purposes of a civil division of the State, differing in extent from the city, whose expenses were ordinarily provided for by taxation ordered by and the avails of which went into the treasury of the State, does not affect the title, as the moneys raised in excess of the statutory authority were not raised for the purposes of such civil division, nor by taxation, but by the bonds of the city and paid into the city treasury and so became the funds and property of the city. (Church, Ch. J., and Rapallo, J., dissenting.)

Where the obligations of a municipal corporation are issued under an unfounded pretence of authority, and the moneys raised thereon paid into its treasury, they become the funds and property of the corporation; and in case of a misappropriation thereof, it alone, in the absence of any controlling legislative enactment, can maintain an action for its recovery. (Church, Ch. J., and Rapallo, J., dissenting.)

The facts that the municipal body and its officers having authority to act in the premises have, with full knowledge, acquiesced in the misapplication of the moneys, and colluded with the defendant in protecting him from responsibility by judicial means or remedies, do not give a right of action to the State, or authorize it to interfere through its attorney-general, by action to recover the moneys, making the wrongdoer and the corporation defendants. (Church, Ch. J., and Rapallo, J., dissenting.)

An omission on the part of the corporation in such an action to defend or to assert its legal rights does not work a transfer of the fund or of the right of action.

In the absence of express legislation to that end the State can assert no sovereign rights over the property of municipal corporations. (Church, Ch. J., and Rapallo, J., dissenting.)

(Argued June 1, 1874; decided November 10, 1874.)

Appeal by defendant Fields from a judgment of the General Term of the Supreme Court in the third judicial department, affirming a judgment in favor of plaintiffs entered upon a verdict.

This action was brought to recover moneys alleged to have been unlawfully and fraudulently paid to defendant Fields by the comptroller of the city of New York.

The complaint alleged in substance that pursuant to an act passed March 30th, 1865, creating a metropolitan fire district (chap. 249, Laws of 1865), there was organized in that year what is commonly known as a paid fire department.

That for the suburbs of the city, to wit: Yorkville, Harlem, Manhattanville and Carmansville, the department organized five engine companies, to wit: Nos. 36, 37, 38, 39 and 40, and three hook and ladder companies, Nos. 13, 14 and 15, composed of not exceeding fifty men each, who were privileged to follow their usual avocations, doing duty on alarm of fires only, and receiving therefor, as compensation, a stipulated sum of $1,000 annually, to the company fund. That the department disbanded these companies, and dismissed the men from service on the 1st day of January, 1868, and at time of disbandment they had been paid in full the stipulated sum. That the men doing duty below Fifty-ninth street were

paid regular salaries, the amounts of which were specified, but gave their whole time. That a few months after these "suburban companies" were disbanded, the defendant Fields, as counsel for some or all of the men, gave notice of a claim on their part to full pay, at the same rate as men doing full duty below Fifty-ninth street, from August 15th, 1865, to January 1st, 1868, which claim was rejected by the commissioners of the fire department as appears by a report of said commissioners, set forth in complaint. That on the 12th of May, 1869, the legislature passed an act, the seventh section of which is in the following words:

"The comptroller of the city of New York is hereby authorized and directed to audit and adjust and pay the claims, not to exceed the sum of $50,000, of members of engine companies Nos. 36, 37, 38, 39 and 40, and hook and ladder companies Nos. 13, 14 and 15, which were organized under the direction of the commissioners of the metropolitan fire department, between the 10th and 31st days of October, 1865, and described in the report of said commissioners, for the years 1865 and 1866, as 'suburban companies.' The said comptroller is hereby authorized and directed to raise the money necessary to pay the sum or sums which may be found due said members of said fire department on said claims as aforesaid, on the stock of the city of New York, issued in the usual form, said stock to be called the 'fire department stock,' payable thirty years after its date, and to bear interest not to exceed seven per cent per annum.

"The board of supervisors of the county of New York are hereby authorized and directed to order and cause to be raised by tax upon the estates by law subject to taxation within the city and county of New York, an amount sufficient in each year to pay the interest on the stock herein authorized, and also an amount sufficient to pay and redeem said stock at its maturity." (§ 7, chap. 876, Laws of 1869.) That under said act certain pretended claims of the members of said companies were presented to the said comptroller, and by him audited and adjusted at $49,277.34 and fully paid.

That the defendant Fields attended to the whole business of presenting such claims, and, except $245 paid to one John Hart, received the whole of the money. That on the 26th of April, 1870, the legislature passed another act, the seventh section of which was in the following words: "The comptroller of the city of New York is hereby authorized and directed to pay the claims which have been found to be due to the members of engine companies Nos. 36, 37, 38, 39 and 40, and hook and ladder companies Nos. 13, 14 and 15, under the provisions of section 7, chapter 876, Laws of 1869, and to raise the additional amount required for such purpose by the issue of stock of the city of New York, in like manner as provided by said section 7, of chapter 876, Laws of 1869; and the interest and principal thereof to be raised, also, in the manner therein provided." (§ 7, chap. 383, Laws of 1870.) That no claims had been found to be due to said members under the provisions of said chapter, except such as had already been paid under the provisions of the same chapter; and that there was not, subsequent to January 1st, 1868, any just, lawful, equitable or other claim of any member or members of any of said companies. That, nevertheless, the defendant Fields, well knowing the premises, falsely and corruptly intending to defraud the public of certain moneys, caused to be made out in writing certain new, false and fictitious claims, amounting in the aggregate to the sum of $459,977.79, in the names of the same persons whose claims had already been audited, adjusted and paid and for the same identical pretended causes of claim, and did present such pretended new claims to the comptroller, and, as pretended assignee thereof, obtained from the comptroller, as upon such new claims, the whole sum of money, to wit, $459,977.79 by a check to his order. That the defendant Fields was a member of the legislature of 1870 and had, prior to its passage, arranged and organized measures for procuring the passage of the said act of 1870 and fraudulently obtaining the assent, real or apparent, of said pretended claimants of such new claims to the use of their

names for the purpose of giving color to such new claims and investing himself with a formal or apparent assignment of said new claims; and that said defendant Fields did, on the 3d June, 1870, cause himself to be recognized by the mayor and comptroller of said city, as the assignee thereof, and thereby obtained said check, which was paid by money raised by means of stock, as directed in said act of 1870, and sold to *bona fide* purchasers. That the city and all its officers who have any power to act in the premises, with notice and full knowledge of such payment and of its fraudulent nature, acquiesced therein, and are colluding and conniving with Fields in the fraud and in protecting him from responsibility for the same by any judicial means or remedies.

The city, in its corporate name, was made defendant and answered, but the answer was subsequently withdrawn.

Defendant Fields, by his answer, denied any knowledge as to such report or that it was binding upon him. He alleged that, under the act of 1869, the comptroller audited claims to the amount of 509,255.13, and paid thereon the sum of $49,277.34; that defendant, as attorney, entered into an agreement with the members of the fire department whereby they assigned to him fifty per cent of any amount that might be collected on their claims as a compensation for his counsel fees and expenses in the collection; that defendant, as attorney, made application to the legislature of 1869, whereupon said provision was enacted. He denied all the allegations of fraud and collusion, or that he arranged or organized measures for procuring the passage of the provision in the act of 1870. He admitted that he received the money as assignee, but alleged that he paid over one-half to the firemen as required by the agreement with them.

It appeared upon the trial, that, under the act of 1869, claims were presented to the comptroller to the amount of $492,773.40, ten per cent of which was paid upon the order of the comptroller. After the passage of the act of 1870 Fields presented a restatement of the claims which, after deducting the amount paid, left unpaid the sum of $459,977.79,

which amount was also paid to defendant Fields upon the order of the comptroller.

Testimony on the part of defendant Fields was offered, that he acted as attorney as alleged in the answer, received the money as such and paid over the one-half to his clients. This evidence was rejected and counsel excepted. At the close of the evidence said counsel moved for a nonsuit, which was denied. He requested the court to submit to the jury the question as to the amount found to be due the claimants under the act of 1869. This was refused and said counsel excepted. The court directed a verdict for the amount· claimed, and also a special finding that no sum beyond $50,000 had been found due under the act of 1869, before the passage of the act of 1870. The jury found and rendered a verdict accordingly.

Further facts appear in the opinion.

*W. A. Beach* for the appellant. No right of action against defendant vested in the plaintiffs. (*People* v. *Suprs.*, 34 How., 379; *People* v. *Suprs.*, 32 N. Y., 432; *Bk. of Com.* v. *Meyer*, 43 id., 187; *Newman* v. *Suprs.*, 45 id., 676.) Neither the State nor the attorney-general is constituted the guardian of public morals or possesses power over public trusts. (*People* v. *Mayor*, 27 How. Pr., 34; *People* v. *Booth*, 32 N. Y., 397; *People* v. *Clark*, 53 Barb., 176; *People* v. *Miner*, 2 Lans., 396.) The people must have a direct interest, either by ownership or by common right, before their attorney-general·can sue. (*Von Hoffman* v. *City of Quincy*, 4 Wall., 535.)

*Charles O' Conor, Wheeler H. Peckham* and *Samuel J. Tilden* for the respondents. The comptroller was not authorized to audit or adjust any claims beyond $50,000. (Laws 1869, 2131, § 7; Laws 1870, 892, § 7.) The act of 1870 must be construed strictly according to the letter. (*Charles River Bridge* v. *Warren Bridge*, 11 Pet·, 420.) The city corporation was not interested in the matters in question.

(Laws 1865, 395, §§ 2, 5, 6, 10, 11, 12, 16, 22, 23; Laws 1866, 719, chap. 315; Laws 1867, 1460.) If the city corporation was the proper plaintiff, the distinct and admitted allegations of collusion and neglect on its part justify the action by the State. (Abb. Dig. Corp., 781, § 121, *et seq.*; *Robinson* v. *Smith*, 3 Paige, 222; *Cunningham* v. *Pell*, 5 id., 607; 3 Edw. Ch., 127; Code, § 119; *Doolittle* v. *Suprs.*, 18 N. Y., 159; *Roosevelt* v. *Draper*, 23 id., 324.)

FOLGER, J.   The first inquiry is this: Is the appellant liable to any party, for the moneys or any part of them, obtained and received by him?

He is not liable unless those moneys were paid to him without authority of law.   There was no authority of law for the payment, unless it is found in the acts of 1869 and 1870. Without those acts the members of the fire companies, whose assignee the appellant was, had no legal claim for any personal compensation.   A brief statement will make this plain.

By the act of 1865 (Laws of 1865, chap. 249, p. 395), there was erected the metropolitan fire district of the State of New York.   The city of New York was comprised within this fire district.   (Sec. 1.)   Four citizens, residents of the district, were to be appointed by the senate, upon the nomination of the governor, to be "metropolitan fire commissioners." (Sec. 42.) They were to form a metropolitan fire department.   They were to possess, all the power and authority conferred upon or possessed by any officers of the then existing fire department of the city of New York, and other powers conferred by the act.   By this grant of power, they had the right to exercise all powers for the management and direction of the then existing fire department of the city of New York, its premises and property; and they had the sole power and authority thereafter, to extinguish fires in that city.   The commissioners were appointed, and in the exercise of these powers, they in October, 1865, organized these fire companies, to perform duty only on alarms of fire, and for an annual compensation to each of the companies, of $1,000.   No compensation was provided, or

meant to be, for any fireman as an individual. The duty to which he was called, was considered to be but an occasional one. It was thought to be rewarded, by any privileges and exemption which all firemen might claim, and by the $1,000, given as a whole sum, to each company in gross. There was no provision made by these commissioners, for payment of any money to any of these firemen, as individuals; and hence there was no provision of law to that end, until the acts of 1869 and 1870.

It may be insisted that the facts, upon which this conclusion rests, were not proven at the Circuit. There was no testimony given thereto. It is, however, substantially averred in the complaint, wherein the substance of the report of the commissioners thereupon is stated, and the truth of that report is alleged. To be sure, the appellant's answer avers, that he has no knowledge nor information sufficient to form a belief as to that report; but he does not specifically deny the averment in the complaint, of the truth of the statement therefrom, as set out in the complaint, as he should have done, to raise issue and require proof from the plaintiff. Nor does the general denial at the close of the answer, apply to this averment of the complaint; for that denial includes only those allegations of the complaint "not specifically answered unto." Moreover, it is plain that there was no contention as to these facts, at the trial; and the case proceeded upon the recognition, tacit or otherwise, by both parties, of the existence of the facts which are averred in the complaint, as to the organization, compensation and disbanding of these companies.

Prior to the act of 1869, then, there was no law upon which those men could found a claim for any recompense to themselves for services as firemen. The legislature in passing that act must be presumed to have known this; to have known that it was acting upon an assertion merely, which had no such support in law or in equity, as would enable the claimants to maintain an action in any court. When, then, that act used the word "claims," it did not mean

that which was due of right, and could be maintained as such. It meant no more than something which was asked for, or asserted to be due, for which a pretence was set up. As, then, there was no basis in law or in equity, for a demand of payment as of right, it follows that the purpose of the legislature was to give. In doing this, it could fix what sum should be given. And so it did, by the declaration, that it should not exceed the sum of $50,000. Nothing can be more clear, than that it willed to give, but to give no more than that amount. Nor does the restriction as to amount apply only to the act of payment. The words audit and adjust in the act, are as much affected by it as the word pay. The comptroller could no more audit and adjust, in the sense of ratifying and allowing, a sum greater than that fixed, than he could pay more than that. He was required to audit, to hear the claimants as to their claims, for this was needed to ascertain, who were the persons who came within the description of the beneficiaries under the act. He was required to adjust the amount of the gift of $50,000, to the number of claimants and their relative interest therein, so that each should receive his fair proportion and no more. And, furthermore, though doubtless the legislature was apprised of the amount claimed, it is not so usual that the amount demanded, falls short of the amount which can be well based upon the pretence for the demand, that it may well be supposed, that the legislature meant to direct the comptroller to ascertain whether, indeed, the claims upon the gift did in fact come up to its amount, even upon the unreal foundation asserted for them. It might be that, even upon the basis upon which they were put by the claimants, and notwithstanding their apparent amount, an investigation into them would keep them within the sum bestowed by the legislature. Though they might go beyond it, and that fact be apparent upon the examination of them made by him, yet he had no power from the act, to allow them above that amount, nor thus to ratify them at any sum above it, nor to impose nor to admit an obligation greater than that. He had no power by any act of his, either of audit, adjustment or pay-

ment, to declare or find due from the fire department, nor from the city, nor from other source, more than the sum of $50,000. Due means owing, and owing must come of a right. There was no right, other than that created by the act making the gift. That was limited to a sum named, and so no more could be found owing, no more could be found due, than that sum. With the purpose plainly declared of paying no more than $50,000, it cannot be that the legislature meant to authorize an audit and adjustment which would find due more than that, which would create an obligation, upon which payment of more than that could be lawfully demanded. Whatever may be the accurate philological definition of the words audit and adjust, we find them in a connection which affects that meaning. As placed in this statute, in the circumstances in which it was passed, they mean the act of receiving from all these men the statement of their claims, and of the facts making them beneficiaries of the public, and the apportionment of the gift among them. The legislature did not, by the act of 1869, intend to declare the legality of the claims, nor to empower any official person to so act, as to make them an obligation due. The act of 1870 comes in as a supplement to that of 1869. There is no direction in it, for a further audit and adjustment. That which had been found due, on the audit and adjustment under the act of 1869, is authorized and directed to be paid. The legislature did not in that act mean that the comptroller should so audit as to admit as due, and thereby create a debt for, more than $50,000. No more did it, by the act of 1870, mean to assume that more had been admitted or found to be due than that sum. The language of the act of 1870 is, to pay the claims which have been found to be due under the provisions of the act of 1869. Now the argument of the appellant rests upon these words, " which have been found to be due," as if they meant that which presented itself to the attention of the comptroller on his examination under the act of 1869, and that as he did perceive that, upon the facts produced to him if they were a legal ground for a claim, there was due and owing

the sum subsequently paid to the appellant, so, as matter of law and of fact, that was the sum which was found to be due. But the acts are to be read together. They are *in pari materia*. The words and phrases used in one are charged with the same meaning when found in the other. "Which have been found to be due," in the act of 1870, is a phrase of the same import as "which may be found to be due" in the act of 1869. We find, in the latter act, authority and direction to the comptroller, to raise money by the issue of stock of the city, necessary to pay the sum or sums "*which may be found due*" on these claims. As he might not, by the express limitation of the act, pay more than $50,000, he might not issue stock for more than that amount. As he might not pay more than that amount, nor issue stock for more than that amount, and yet as he may and is required to issue stock to an amount of all "which may be found to be due," it is plain that the legislature subjected that phrase to the same limitation, and meant that no more than $50,000 should be found to be due, by any audit and adjustment under it. When, in the act of 1870, it uses the similar phrase, "which have been found to be due," and adds to it the particularization of when and where and how, by saying under the provisions of the act of 1869, it is plain that the phrase was used in the same sense, and within the same limitation. The act of 1870 goes no further than that of 1869. It is to be borne in mind, that in construing these acts, we are looking for the intention of the legislature. That is to be learned from the words used by it, as affected, explained and limited, the one or more by all the rest. When, in the act of 1870, the legislature refers to the act of 1869, and speaks of that which may have been found due under its provisions, we are taken back to that act, and can but see, that in 1870 it did not mean to declare, that any more was due or had been found due upon those claims, than would rise in amount to the limit fixed by the former act. Nothing was due, that is owing, to these men to which they had a legal right, before the act of 1869. On the passage of that act, the directions contained in it made due and owing

to them, a sum no greater than $50,000. The exact amount thereof, up to that limit, was to be arrived at by the comptroller's audit. It is the amount arrived at by that audit, not exceeding that limit, and not already paid, of which the act of 1870 authorizes and directs the payment. This was the intent of the legislature as shown by the language of the two acts. That there might have been another intent, on the part of the promoters of this legislation, is probable from the facts shown upon the trial. But these facts do not show through the language of the enactments, nor does it appear that they were in the possession of the legislature.

There are some considerations ingeniously urged, which, as put, are not in harmony with this view. Thus the act of 1870 gives authority to raise "the additional amount" required for the purpose of paying the claims which have been found to be due. This, it is urged, should be construed to mean an amount in addition to the sum fixed by the act of 1869. But it cannot be. It is an additional amount needful to pay the claims which may have been found due under the provisions of that act, whereby no more than $50,000 could be found due.

It is further urged, that if no more was still to be paid than the unpaid portion of the $50,000 there was no need of further legislation. This is true; but that an enactment to one end, is not strictly necessary thereto, is not so strong a reason that it must have been intended for another end, as to overcome the evidence of intention, derived from the language used by the law makers. It is said, that it is ludicrous to suppose that the legislature, would not only multiply needless commands to the comptroller to pay an audited claim, but direct the issue of city bonds running thirty years to enable the payment of $722.66, which, it appears, was the amount not paid of the sum of $50,000. Indeed, there is a ridiculous disparity between the amount of this unpaid residue and the financial machinery proposed for meeting it; but not greatly more so than in the case of the act of 1869. For the city of New York to supply its treasury with the sum of $50,000, in the

year 1869, surely did not need the issue of a thirty years' stock; unless in the absence of any other lawful mode of raising or obtaining that sum. And for that municipality, with its great resources and its great credit, to be put to such means to raise so small a sum to it as $50,000 does indeed seem unnecessary, unless a necessity arose from the want of any provision of law enabling its financial officers otherwise to procure that sum for that purpose. If such necessity existed the provision is no longer ludicrous. And as it existed, if at all, in 1870 as well as in 1869, it is no more ludicrous to apply it to the unpaid residue of $722.66 than to the sum of $50,000. Furthermore, it may be presumed that the comptroller would not issue stock in bonds of uneven amounts, but would act in accordance with the ways of financial men, and that he had already prepared, before the act of 1870, the stock for issue to the even amount of the sum authorized by the act of 1869. The ten per cent allowed and paid by him upon the claims presented was arbitrary. It did not fully comply with the act of 1869 ; it was evidently adopted for the convenience of his office in making calculations of amount due to each of so many claimants, so that the authority in 1870 is not necessarily to be read as for an issue of new stock to the sum of $722.66, but for an issue of so much as was unused in 1869, or for an application of moneys already derived from an issue of stock under the act of 1869 for the whole even sum of $50,000. Thus, there is not to be imputed to the legislature, the absurdity which the appellant contends would belong to it, if the view of these statutes is adopted which we have set forth.

It follows that a payment by the comptroller to the appellant, and the receipt by him, of more than $50,000 was entirely without authority of law.

It will be seen that we have placed this conclusion, upon the official inability of the comptroller to audit, and find due and owing and allow upon these claims, any more than the sum of $50,000. Any action beyond this was *coram non judice* and void. It is claimed by the appellant, that as a

matter of fact the comptroller did find, that there was due upon these claims more than that sum. We think that the testimony shows, that there did appear before the comptroller, in 1869, such statements from the claimants, of the time for which they had acted, as when measured in money by the wages paid to the hired members of the fire department, would amount to more than the sum awarded by the act of that year. But we are not inclined to think that, as matter of fact, the comptroller ascertained, as an official conclusive result, that there was more due than that sum. The official and binding result arrived at, was that the claims were enough in amount to cover the sum awarded; and so much as that was officially found due upon them. It is not necessary to do more, however, than to hold, that as there was no authority in the act to audit at a sum greater than that named in the act, so there could have been no official finding to be due more than that amount.

The payment to the appellant was illegal. Is there, for this reason, a right of action somewhere, to recover from him the whole or a part of the moneys he received?

There are allegations in the complaint of false and fraudulent intent and conduct on the part of the appellant, in relation to these claims, the presentment and payment of them, and in his action as a member of the legislature which passed the act of 1870. There are also allegations of acquiescence, with knowledge of his fraudulent intent and conduct, on the part of the city of New York and its officials, and of collusion and connivance, on the part of the city and its officers, with the appellant. These allegations are all denied by the appellant's answer. There seems to have been no direct proof made upon them. Can it be inferred by the court, as matter of law, or as so plain that it need not be left to a jury, from the fact of the payment having been made and received without authority of law, that the appellant received it fraudulently and corruptly? In one of the briefs submitted to us, on the part of the plaintiffs, it is conceded that this action is not founded upon any theory of the civil liability of the appellant for his acts as a

member of the legislature.    They are alleged, only as charac-
terizing the act of presenting the claims to and receiving the
money from the comptroller.    But the appellant, while
admitting that he voted as a member of assembly for the act
of 1870, denies that he knew of its purport and provisions in
respect to these claims.    The case, so far as the allegations of
fraudulent conduct against the appellant are concerned, rests
upon the facts that there was never any legal claim of his
assignors against the fire department nor the city; that the
legislature of 1869 and 1870 gave no legal claims nor right
to them to an amount over $50,000; that it may be presumed
against the appellant, that he knew that these were the facts
of the case, and hence knew, also, that the comptroller, the
financial officer and agent of the city, paid this money with
no authority in fact from his principal, and no authority in
law from any source.    If it be doubtful whether there is enough
here to make out fraudulent action, on the part of the defend-
ant, in so clear a manner as to warrant the court in directing
a verdict, we have to say that it is not needed that we pass
upon that question.    An action may be maintained on other
grounds.    The payment was made and received without any
lawful power in the comptroller to make it.    The defendant
is chargeable with knowledge of this.    It was a payment by
an agent, who had no authority as such, to make it.    It was,
then, no payment by the principal in mistake of law or
ignorance of facts.    The principal, in legal view, had no part
in the payment, and it was made against its will.    It was
equivalent to an appropriation by the appellant of the moneys
to his own use, with the acquiescence and help of the officer
of the city, who was authorized to pay them out no other-
wise than in accordance with law.    He having made the pay-
ment unlawfully, it was an act not within the scope of his
agency and does not bind his principal.    ( *U. S.* v. *Bartlett*,
Davies, 9; *Stevenson* v. *Mortimer*, Cowp., 805; *Taylor* v.
*Plumer*, 3 M. & S., 562.)    There is, for these reasons, a right
of action somewhere, against the appellant, to recover the
whole or a part of these moneys.

Sickels—Vol. XIII.      64

It is urged that the appellant received this money as the attorney for these men, and that as he has paid over to them the share agreed upon by him and them, he ought not to be liable for more than the share retained by him. There is no proof that he acted as attorney and counsel for them. The proof is, that he received the whole money as assignee of the whole of it. There is no proof of any agreement between him and them, nor of any payment by him to them. Evidence thereof was offered by the appellant, and rejected under exception by him, as immaterial. If it was material, it was error to reject it; so that the case may be considered as though the evidence had been received. We do not think that the proof would protect the appellant. If it was illegal to receive the money, it was illegal for him to dispose of it, save to return it to the city treasury. If he knew that it was illegal to receive it, and that it was a wrong for him to do so, and he is therefore liable for that part retained by him; he also knew that it was illegal for his clients or principals to receive, and that it was wrong for him to pay over any part of it to them. He cannot thus defend himself from liability for the whole. (See *Stephens* v. *Elwall*, 4 M. & S., 259; *Snowden* v. *Davis*, 1 Taunt., 359; *Sharland* v. *Wildon*, 5 Hare, * 469.) This is not like the case of an attorney at law who knowingly prosecutes an unfounded claim in the courts, by the forms and processes of the law, and recovering judgment, receives and pays over the avails. There, when final judgment has been rendered, it is the law of that case, for the parties to it; and it is the law itself which delivers the avails of the judgment to the recipient. It is not so here.

The inquiry is: Second. Whether the appellant is liable to the plaintiffs in this action.

The question here presented has been of late much considered in this court, in the case of *The People* v. *Ingersoll, impleaded*, decided June 9, 1874.* The appellant claims that the judgment of this court in that case, is conclusive in this

* *Ante*, p. 1.

case. The respondents suggest features in this case which materially distinguish it, as they claim, from that.

One of these is, as is urged, that the money received by the appellant was the property of the State, or the State had such a right and title therein, as to afford ground for a right of action to recover it. It is no more in this than in that case, alleged in terms, that the money belongs or belonged to the plaintiff. In this case, as in that, the appellant is not sued as an express trustee, but as a wrong-doer in obtaining the money, and for a completed wrongful act. It is explicitly held in that case, that unless there is a right of property in the State to the money so received, there is no right of action. This is to be taken with the qualification, that the question is there reserved and not passed upon, of whether the State would not have a right to interfere in case of a refusal to sue, and of collusion with the wrong-doer, on the part of the municipal or other body, in whom was the title to the money and the primary right of action therefor. Though title in the State to the money is not alleged in terms, it is suggested in argument that the facts averred and proven or admitted, show a title. These facts do not differ from those in *Ingersoll's Case (supra)*, save that here the legislative direction was to raise money for the purposes of a statutory civil division of the State, differing in extent from the city of New York, whose expenditures were ordinarily provided for by taxation ordered by the State, the avails of which passed into the State treasury, and were paid from thence in the ordinary course of disbursement of that civil division; so that the moneys raised for that civil division, did ordinarily go into the State treasury and come under its control, with a right thereto in the State. And had they been wrongfully received therefrom, or intercepted on their way thereto, the State might maintain an action therefor. But the moneys here sued for were not raised for the purposes of that civil division. The very ground of the action is, that the purpose for which the moneys were raised was an illegal, false and fictitious purpose, and was not the purpose of the fire department. They were

not raised in the manner directed by the act creating that civil division. (See § 10 of act of 1865.) The legislature directed the raising of them in a new and different manner. Hence, they never became moneys of the State. They were not raised by taxation, but by the bonds of the city, and they passed into the treasury of the city, and not into the treasury of the State (§ 16 of act of 1865), and there being no claim upon them for any legitimate purpose of the fire department, they became and were an unexpended and an unappropriated surplus, the funds and property of the city ; as much so as if, upon any other unfounded pretence of authority, the comptroller had issued the stock of the city, and obtaining for it half a million of dollars, had deposited it with the city treasurer. The facts of this case make no material distinction of it, from that referred to, and that is in this respect controlling upon this. Another distinction suggested is this : It is alleged in the complaint that ever since the payment of this money to the appellant, the city of New York, and all of its officers who might or could exercise any power or authority in the premises, have, with full notice and knowledge of the facts, acquiesced in the misapplication of the moneys, and colluded with the appellant in protecting him from responsibility by any judicial means or remedies. This allegation is denied by the answer of the appellant. There is no direct proof made of its truth. The city of New York is a party defendant to the action. It made answer to the complaint, but withdrew it, and is without an answer upon the record. The material allegations of the verified complaint are to be taken as admitted by it. We think that the question is thus fairly raised in the case, whether if a municipality has a right of action for its money wrongfully received from its treasury, and refuses to prosecute for a recovery, the State may, in its character of *parens patriæ,* bring action nominally for itself, but really in behalf of the individuals or body of citizens, who are presently or ultimately, to be affected by the wrongful payment and misapplication. It is true that the averment of the complaint is denied by the answer of the appellant. It is admitted by

the city. It stands upon the record, so far as it is concerned, undenied. The judgment by default, which has been or may be taken against the city, will always be an adjudication settling that fact as against it. And 'this adjudication will always be available, not only to the people, who are the plaintiffs in the action, but also the appellant, the co-defendant, as a final determination of that question against the city. So that, if that fact gives a right to the State to interfere and bring an action, it is admitted by the city to have existed when this suit was commenced; and an adjudication based upon that admission will always enable the appellant, notwithstanding he has put the fact in issue, and it has not been proven upon the trial against him, to interpose a judgment in this action against him and the city, of a recovery of these moneys, in bar of another action by the city against him for a recovery thereof. Being a fact admitted of record, it binds all parties to the action: the party defendant who has admitted, and also the party co-defendant, because it takes from him the opportunity of saying that if recovery is had in this action against him, he is still liable to his now co-defendant in another action for the same cause.

The money of a municipal corporation has been illegally paid by its officers, and illegally received by the appellant. The municipality and its officers refuse to sue for a recovery thereof. This presents the case of a fund, held in trust for the public purposes of the members of a municipal corporate body, which has been unlawfully despoiled, and the official trustees of which, with whom is the primary right of action, refuse to act for its protection and reinstatement, and for the redress of the injury to the body of the tax-payers, present or future, who are, in a sense, the *cestuis que trust.*

An individual tax-payer, or a number of tax-payers, may not maintain such an action. (*Doolittle* v. *Supervisors*, 18 N. Y., 159; *Roosevelt* v. *Draper*, 23 id., 324.) They do not represent, and may not assume to act for, the whole public body injuriously affected. Hence, in case the municipality and its officers refuse to act, there is no party to approach the

courts, unless there is some other and superior trustee for the public, who may rightfully interfere. There can be no other, unless it is the State. Can the State thus interfere?

In *The People* v. *Ingersoll*, this court purposely refrained from deciding, or even intimating an opinion upon this question. There, as here, the action was to recover a sum certain, the avails of the bonds of a municipal corporation, issued by authority of the State legislature, to provide means for the payment of municipal liabilities. The bonds, in both cases, were to be redeemed at maturity by municipal taxation. The avails of these bonds, it was alleged in each case, had come to the possession of the defendant by means of fraudulent devices and practices of himself, and others associating with him. The moneys realized by a sale of the bonds of the county, in that case, were regarded and treated as the moneys of the county, to the same extent and subject to the like control, as if they had been raised for the same special purpose by present taxation, and paid into the county treasury, or were in the possession of any other of the county agents. The sale of the bonds was an anticipation of the tax, and the issue of the bonds was an exercise of the taxing power, in one form. The burden was and is upon the tax-payers of the locality, and whether the money was levied presently, or borrowed upon its credit, and levied thirty years thereafter, could make no difference in passing upon the question of the ownership of the money. In either case, as this court held, the moneys were the moneys of the municipality.

It was conceded in the *Ingersoll Case*, as well by the counsel for the plaintiffs, as in the dissenting opinion in this court, that the court could not in that action adjudicate what should be the final destination of the money in controversy. Such concession seemed to be the yielding of the question, to whom the money belonged, and an admission that it did not belong to the State, the plaintiff in the action; and in connection with the position of the most eminent of the counsel for the plaintiffs, that the question, "who owns the money?" was but another way of putting the question, " who can maintain the action ?"

and that the party regarded in the law as the technical owner of the money, was the party to maintain the action; was fatal to the claim of the plaintiffs to recover. The two positions are not consistent with the claim to recover, and the difficulty in finding a solid ground, on which to rest successfully a right of the people of the State, by the attorney-general, to maintain the action, is made very apparent by a bare statement of the admissions and positions, so absolutely incompatible with the theory of the action.

It was possible in that action; if it had been allowable upon the facts alleged in the complaint, and a liability of the defendant Ingersoll to account to the people of the State, for the money alleged to have been fraudulently obtained and illegally received by him from the county of New York should have been established; to give judgment in such form as to enforce the liability. The court below had not, in that action, given force and finality to the remedy, and if the plaintiffs were, upon the complaint, entitled to any relief, if they should have had any standing in court as against the defendant, the judgment would have been reversed and the cause remanded, to the end that the proposed relief, legal and equitable, might be granted. It was because the plaintiffs did not, by their complaint, make a case for any relief, legal or equitable, that the demurrer was sustained and judgment given for the defendant. Upon this appeal we are shut up to the question, whether the plaintiffs, the people of the State, are entitled to a judgment in their favor for the money illegally and fraudulently taken from the city of New York. They have recovered a money judgment, by which they are adjudged to be entitled as owners, to the sums awarded. It is not a recovery in trust, or for the benefit of any person or corporation. The judgment does not recognize, but on the contrary is inconsistent with, any right or interest of any other party in or to the money. The judgment is, that the plaintiffs recover the amount specified, and that they have execution therefor, and no other or ulterior disposition of the fund is made, or is consistent with the record. It is a legal judg-

ment, founded upon a supposed legal and technical right of the plaintiffs to the money, in their own right. The fact that the corporation of the city of New York, in whom is the legal right to the money and the cause of action, is a party to the record as a defendant, and has not defended the action, or controverted the claim of the plaintiffs, does not avail the latter. Such an omission of the corporation to assert its legal rights, cannot work a transfer of the fund and right of action to the plaintiffs. It may be that it was a breach of trust, and of duty, on the part of the managing body and official representatives of the municipality, but cannot operate as a forfeiture of the rights of the constituents, the *cestuis que trust*, or confer upon the plaintiffs a legal right to the money, or authorize the people, by their attorney-general, to take the place in court, in pursuing the wrong-doer and asserting a right to the money, which the law gives to the legally entitled custodian and trustee. The corporate authorities of the city of New York can no more donate, or transfer, without consideration or authority of law, the property of the city to the State, than they can to the defendant or any stranger. Every act of that kind would be *ultra vires* and would confer no legal right upon the transferee.

But the city authorities did not, by omitting to defend the action, admit or concede the title of the plaintiffs. No judgment was demanded concluding their rights; and whether, by reason of the transactions alleged in the complaint, the plaintiffs had a legal cause of action against the defendant did not concern the city of New York. Does, then, the averment, regarding the same as proved or admitted, that the several officers of the city, as well as of the county of New York, "if any, who might or could exercise any power or authority in the premises had, with notice and full knowledge of such payment and of its fraudulent nature, acquiesced and still do acquiesce in such fraudulent misapplication of the said moneys, and at all times since such application, were and still are colluding with the said Thomas C. Fields in the fraud aforesaid, and in protecting him from responsibility for the

same by any judicial means or remedies," give to the plaintiffs a right of action which, but for those facts thus averred, they could not have? It is noteworthy, that there is no assertion anywhere in the complaint, that this action is prosecuted for or in the interest of the city. Neither is it expressly or impliedly admitted, in the clause alleging collusion of the city officials, that the money or the rights of the same are now or ever were in the city, or in any person or body other than the plaintiffs. Those who are now put forward as the *cestuis que trust* and in whose interest it is sought to sustain the recovery, are nowhere averred to be the real parties in interest; and the relation now assumed by the plaintiffs, of trustees, is not averred in the complaint. It is a fact, not wholly without significance, that the distinguished counsel for the plaintiffs did not deem it important to resist, by appeal, the striking out of a similar clause from the complaint in the *Ingersoll Case*, as it is likely they would have done, had it been considered that the facts in that clause averred, were essential to give to the plaintiffs a standing in court, as trustees or otherwise, if every other claim of right should be denied. But neither counsel nor parties are estopped or foreclosed by this implied admission of the immateriality of the facts now relied upon; and the question must be passed upon as if no such admission had been made.

Notwithstanding the caution of the court, in its reference to the question now under consideration, in disposing of the *Ingersoll Case*, we cannot but regard the decision in that case, and the reasons upon which it went, as decisive of the present question. Most certainly the fraud and collusion of the city officials alleged, could not and did not deprive the city of New York of its property rights, or confer title to the money in dispute on the State. Such an idea would be preposterous, and is not put forth by any one. The loss to the city by the misfeasance or malfeasance of its official representatives and agents, could only be such as naturally and necessarily resulted from the omissions or acts, and not such as could form a forfeiture of legal rights; and because loss might

ensue to the city, as a consequence of the neglect or wrong-doing of its servants or agents, it would by no means follow as a legal or logical sequence, that the title to the money, and what might be saved, became vested in the State, or any other body, whose representatives would be more vigilant in protecting, or pursuing and retaining it. But the judgment in this action does accomplish just that, and awards the money to the plaintiffs, to the exclusion of the city.

The prerogative rights of the State, as sovereign, over municipal corporations, and their civil and property rights, and the extent to which they could be asserted by the administrative or executive officers of the State government, were necessarily considered in the *Ingersoll Case;* and the judgment of the court was, that while the absolute sovereignty of the State, over the municipalities of its creation, was conceded, its actual exercise was limited by the legislation upon the subject, and that no power was delegated to the attorney-general, or other State officer, to assert any such right of sovereignty over the property of municipal corporations, in the absence of express legislation to that end. We then held that corporations of that nature could not be deprived of their franchises or property by implications of power, either in the attorney-general or other officer. The money sought to be recovered in that case had been obtained by fraud, and by collusion and neglect or breach of duty on the part of the city agents, and, so far as appeared, no claim was made to the money by the county, or effort put forth to recover it, and every intendment was necessarily in favor of the plaintiffs. Substantially every element was in that case that is to be found in that now before us, with the additional circumstance favorable to the plaintiffs, that they could have had any relief to which by the case made they were entitled. The court adjudged that the plaintiffs had no standing in court, and dismissed the complaint. If there is any right or authority in the attorney-general, representing the State, to maintain this and the like action, or any action to recover corporate or trust funds fraudulently misappropri-

ated or converted, or to call defaulting official trustees or wrong-doers to account for moneys thus diverted from their proper destination and use, such right exists concurrently with a like right in the municipal corporations, and does not depend for its exercise as against a wrong-doer, upon any want of fidelity or willingness to prosecute of the municipal authorities. (*Attorney-General* v. *Wilson*, 1 Craig & Phillips, 1.) The averment of collusion or neglect to prosecute, does not give vitality to the authority, nor is it necessary to put the attorney-general in motion. In other words, it has no materiality. It is not necessary to refer to the cases from the English reports, in which the attorney-general has intervened to enforce the performance of trusts by corporate authorities and official trustees, or the reasons upon which the decisions have proceeded, or the foundation upon which, in England, the jurisdiction of the courts and the right of the crown rest. They are considered sufficiently in *The People* v. *Ingersoll.* It suffices to say here, that all those actions are in equity, and brought directly to enforce a trust, and compel the application of trust funds by the appropriate trustee to the objects of the trust, and for such other incidental relief, either against the guilty trustees, or those to whose possession the trust funds had come, as the circumstances of the case asked for. There is no parallelism in those cases and this, and if the same existed, and the same practice prevailed here as in England, they would have no relevancy upon the question before us. The case is not distinguishable by any material circumstance from *The People* v. *Ingersoll*, and must be adjudged accordingly.

The judgment should be reversed and new trial granted.

All concur except Church, Ch. J., and Rapallo, J., dissenting.

Judgment reversed.